IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.  2:21-CR-49-MHT-JTA-6 |
| | ) | |
| THOMAS MICHAEL SISK | ) | |

## PLEA AGREEMENT

## I.  BACKGROUND INFORMATION

### A.    Attorneys

Defense Attorney:               Russell Crumbley

Assistant United States Attorneys:    Jonathan S. Ross,
                                      Alice S. LaCour, and
                                      Brett J. Talley

### B.    Count and Statute Charged

Count 1:       18 U.S.C. § 371 – Conspiracy

### C.    Count Pleading Pursuant to Plea Agreement

Count 1:       18 U.S.C. § 371

### D.    Statutory Penalties

Count 1:       18 U.S.C. § 371

A term of imprisonment of not more than 5 years, a fine of not more than $250,000, or twice the value of the property involved in the transaction, whichever is greater, or both the fine and imprisonment; a term of supervised release of not more than 3 years; an assessment fee of $100; and an order of restitution.

### E.    Elements of the Offense

Count 1:             18 U.S.C. § 371:
      First:         Two or more people in some way agreed to try to accomplish a shared and
                     unlawful plan;
      Second:        The defendant knew the unlawful purpose of the plan and willfully joined
                     in it;

| Third: | During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; |
| Fourth: | The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy. |

| Object Offense: | 18 U.S.C. § 1341: |
| First: | The defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; |
| Second: | The false pretenses, representations, or promises were about a material fact; |
| Third: | The defendant acted with the intent to defraud; and |
| Fourth: | The defendant used the United States Postal Service by mailing or causing to be mailed some matter, communication, or item to carry out the scheme to defraud. |

## II. INTRODUCTION

Jonathan S. Ross, Alice S. LaCour, and Brett J. Talley, Assistant United States Attorneys, and Russell Crumbley, attorney for the defendant, Thomas Michael Sisk, pursuant to Rule 11(c)(1)(A) and Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, with the authorization of the defendant, submit this plea agreement. The terms are as follows.

## III. THE GOVERNMENT'S PROVISIONS

1.      Pursuant to Rule 11(c)(1)(B), the government agrees to recommend a sentence of no greater than the bottom, that is, the lowest number, of the advisory Guidelines range, as calculated by the Court at the sentencing hearing.

2.      The government acknowledges that the defendant assisted authorities in the investigation and prosecution of the defendant's own misconduct by timely notifying the government of the defendant's intention to enter a guilty plea, thereby permitting the government to avoid preparing for trial and allowing the government and the Court to allocate resources efficiently. Provided the defendant otherwise qualifies, and that the defendant does not, before the date of the sentencing hearing, either personally or through the actions of the defense attorney on

behalf of the defendant, take any action inconsistent with the acceptance of responsibility, the government will move at or before the sentencing hearing for a further reduction of one level. See U.S.S.G. § 3E1.1(b). Determination of whether the defendant met the defendant's obligations to qualify for a reduction pursuant to § 3E1.1(b) is at the sole discretion of the government. Further, the government reserves the right to oppose the defendant's receiving a two-level reduction pursuant to § 3E1.1(a) should the government receive information indicating that, between the date of the plea hearing and the date of the sentencing hearing, the defendant, either personally or through the actions of the defense attorney on behalf of the defendant, has acted inconsistently with the acceptance of responsibility.

3.       The government reserves the right to argue for or against the application of any specific offense characteristic or Chapter 3 adjustment. Additionally, the government reserves the right to provide information to the United States Probation Office (Probation) regarding the defendant's criminal history. This agreement does not obligate the government to make any recommendation regarding the defendant's criminal history score or resulting criminal history category.

4.       Pursuant to Rule 11(c)(1)(A), the government agrees that it will not bring any additional charges against the defendant for the conduct described in the Indictment.

### IV. THE DEFENDANT'S PROVISIONS

**A.       Plea and Sentencing**

5.       The defendant agrees to plead guilty to Count 1 and to make factual admissions of guilt in open court. The defendant further agrees to waive any right the defendant may have to subsequently withdraw the guilty plea pursuant to Rule 11(d). The defendant also promises to

3

refrain from taking any action inconsistent with the defendant's acceptance of responsibility for the offense to which the defendant is pleading guilty.

6.      The defendant reserves the right to request a downward variance, that is, a sentence below the bottom, that is, the lowest number, of the advisory Guidelines range.

7.      The defendant acknowledges that the defendant will not be allowed to withdraw the guilty plea in the event that the Court does not accept any or all of the recommendations made pursuant to Rule 11(c)(1)(B).  The defendant also understands that the defendant will be allowed to withdraw the guilty plea in the event that the Court does not accept any or all of the provisions set forth pursuant to Rule 11(c)(1)(A).

8.      The defendant agrees not to commit any other federal, state, or local offense while awaiting sentencing, regardless of whether that offense is charged or chargeable.  The defendant agrees to provide truthful information to Probation and to the Court in all presentence and sentencing proceedings.

**B.      Fines and Restitution**

9.      The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of the Court.  The defendant acknowledges that the full fine and restitution amounts shall be considered due and payable immediately.  If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of Probation at any time, the defendant agrees that the United States Bureau of Prisons and Probation will have the authority to establish payment schedules to ensure payment of the fine and restitution.  The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off from federal payments, execution on non-exempt property, and any other means the government deems

appropriate.   The defendant also agrees that the defendant may be contacted by government officials regarding the collection of any financial obligation imposed by the Court without notifying the defendant's attorney and outside the presence of the defendant's attorney.

10.     To facilitate the collection of financial obligations imposed in this case, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or third party.   Further, the defendant will, if requested by the government, promptly submit a completed financial statement to the Office of the United States Attorney for the Middle District of Alabama in a form the government provides and as the government directs.   The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful. The defendant expressly authorizes the government to obtain a report on the defendant's credit in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

11.     The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this agreement or that may be imposed upon the defendant by the Court.   In addition, the defendant promises that the defendant will make no such transfers in the future.

12.     The defendant agrees to pay the $100 assessment fee on the date of sentencing.

**C.     Freedom of Information Act Waiver**

13.     The defendant agrees to waive and hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, but not

limited to, any records that may be sought under the Freedom of Information Act, see 5 U.S.C. § 552, or the Privacy Act of 1974, see 5 U.S.C. § 552a.

**D.     Forfeiture of Assets**

14.     The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession of the government, the defendant, or defendant's nominees.

15.     The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal or civil judicial or administrative forfeiture action.  As such, the defendant hereby withdraws any claim the defendant may have filed in any administrative forfeiture action and agrees to the declaration of forfeiture.  The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at the sentencing hearing, or incorporated into the judgment.

16.     The defendant admits and agrees that the conduct described in the factual basis section below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from

the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

17.     The defendant agrees to take all steps necessary to assist the government in obtaining clear title to forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant agrees to be interviewed by the government, prior to sentencing, regarding such assets and their connection to criminal conduct.  The defendant agrees that Rule 11 of the Federal Rules of Criminal Procedure and § 1B1.8 of the Sentencing Guidelines will not protect from forfeiture assets disclosed by the defendant as part of any cooperation provided by the defendant.

18.     The defendant agrees that the government is not limited to forfeiture of the property specifically identified for forfeiture in this plea agreement.  If the government determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the government shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the

7

value of any property described above.  The defendant expressly consents to the forfeiture of

substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

19.     Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine,

restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant

in addition to forfeiture.

20.     The defendant agrees that, in the event the Court determines that the defendant has

breached this section of the plea agreement, the defendant may be found ineligible for a reduction

in the Guidelines calculation for acceptance of responsibility and substantial assistance, if

applicable, and may be eligible for an obstruction of justice enhancement.

21.     The defendant agrees that the forfeiture provisions of this plea agreement are

intended to, and will, survive the defendant, notwithstanding the abatement of any underlying

criminal conviction after the execution of this agreement.  The forfeitability of any particular

property pursuant to this agreement shall be determined as if the defendant had survived, and that

determination shall be binding upon the defendant's heirs, successors, and assigns until the agreed

forfeiture, including satisfaction of any preliminary order of forfeiture for proceeds.

### V. FACTUAL BASIS

22.     The defendant admits the allegations charged in the Indictment and understands

that the nature of the charges to which the plea is offered involves proof as to Count 1.  Specifically,

the defendant admits the following to be true and correct:

> a.  At all times relevant, the defendant, THOMAS MICHAEL SISK, was a resident of
> Limestone County, Alabama.  SISK worked as the superintendent of Limestone
> County Schools (LCS).

8

b.  SISK acknowledges and agrees that, should this case go to trial, the government would be able to prove the background information contained in pages 1 through 16 and paragraphs 1 through 5 and 7 through 59 of the Indictment.

c.  On or about an unknown date in 2016, SISK traveled in the same vehicle as Athens City Schools (ACS) superintendent, co-defendant TREY HOLLADAY to a superintendent's meeting in Moulton, Alabama.  During that car ride, SISK and TREY HOLLADAY discussed an ongoing lawsuit involving ACS and LCS and other school districts that educated students residing in Limestone County, namely: Madison City Schools and Huntsville City Schools.  The lawsuit involved the allocation of property and sales tax revenue generated in Limestone County. Generally, ACS and LCS sought to retain all of the local tax revenue generated in Limestone County.  Madison City Schools and Huntsville City Schools desired to obtain a share of such revenue proportionate to the number of Limestone County students they educated.  During their conversation, TREY HOLLADAY told SISK that they needed to find a way to "balance the playing field."  SISK understood this to mean that ACS and LCS needed to find a way to add students so as to offset money lost to Madison City Schools and Huntsville City Schools.

d.  Thereafter, SISK discovered that ACS was able to add additional students (and therefore get a larger share of the local tax revenue) by enrolling students in the ACS virtual school—Athens Renaissance School (Athens Renaissance).

e.  During a subsequent Rotary Club meeting during sometime in 2016, SISK confronted TREY HOLLADAY and said "you're killing me; you're getting all

9

these virtual kids and all these funds; you're building a new high school; [Madison City Schools] built a new school and is taking our kids; we're in the middle of this lawsuit; and you are getting all these virtual students."   TREY HOLLADAY responded that he had "a guy who might be able to help [SISK]."

f.   Thereafter, TREY HOLLADAY put SISK in touch with co-defendant, GREGORY EARL CORKREN.  By the time SISK met CORKREN, CORKREN had formed Educational Opportunities and Management, LLC (Ed Op).  SISK acknowledges and agrees that, if this case went to trial, the government would be able to prove that, by the summer of 2016, CORKREN, through Ed Op, was: (1) offering various incentives to private schools (including monetary payments, laptop computers, and access to online curriculum); (2) in exchange, asking the private schools to provide him with student academic and identifying information; and (3) giving that private school student information to ACS officials for the ACS officials to use to falsely enroll the private school students in Athens Renaissance.  CORKREN was doing all of this at the direction of TREY HOLLADAY.

g.   At some point during the summer of 2016, TREY HOLLADAY informed SISK that CORKREN was a "good guy."  TREY HOLLADAY also told SISK that if SISK "help[ed] [CORKREN] out," CORKREN would help SISK out.  TREY HOLLADAY also told SISK that CORKREN would be willing to provide SISK with anything SISK needed or wanted.  SISK inferred that TREY HOLLADAY was saying that CORKREN would be willing to give SISK money.  TREY

HOLLADAY then told SISK that SISK needed to get on board "before the well dries up."

h.  Thereafter, SISK and CORKREN agreed that CORKREN would provide students for LCS's virtual school, the Limestone County Virtual School. In exchange, SISK would pay CORKREN a monthly fee for each student CORKREN provided. SISK and CORKREN would later agree that these students would be private school students who were not actually receiving full-time education from LCS. TREY HOLLADAY was aware of and facilitated this agreement.

i.  SISK and CORKREN then agreed upon a contract between LCS and Ed Op. CORKREN signed the contract for Ed Op; Sisk executed it for LCS. The preamble of the contract stated: "[T]here are anticipated to be a significant number of LCVS [Limestone County Virtual School] full-time and guest enrollment students in the Marengo County, Alabama area . . . during the 2016-17 school year" and "EOM [Ed Op] desires to contract with LCS to provide it with such administrative and logistical services in the state of Alabama for homeschooled students that are not enrolled in private schools." In the official contract approved by the LCS board of education, LCS agreed to pay Ed Op $45 per student serviced each month.

j.  Thereafter, SISK instructed CORKREN to invoice LCS at a rate of $55 per student per month. SISK told CORKREN that LCS would pay at the invoiced rate. CORKREN was to then set aside the $10 per student per month payment that was beyond the agreed-upon amount. SISK told CORKREN that he would instruct CORKREN on what to do with the extra money at a later time.

11

k.  CORKREN then proceeded to submit invoices to LCS each month that charged the district $55 per student.

l.  SISK acknowledges and agrees that, if the case went to trial, the government would be able to prove that, in or about August of 2016, CORKREN came into contact with an official of Monroe Academy.  CORKREN offered the Monroe Academy official: (1) access to Odysseyware; (2) laptop computers; (3) increased internet capabilities; (4) standardized testing; and (5) monetary payments.  In exchange, CORKREN asked the Monroe Academy official to provide student information needed to enroll the Monroe Academy students in the Limestone County Virtual School.  LCS did not have access to Odysseyware.  Instead, CORKREN allowed Monroe Academy students to use ACS's Odysseyware license.  Monroe Academy officials agreed.

m.  SISK acknowledges and agrees that, if the case went to trial, the government would be able to prove that, on or about August 26, 2016, the Monroe Academy headmaster completed and signed, on behalf of each student at Monroe Academy: (1) a Limestone County Schools Virtual/Non-Resident Enrollment Form; and (2) what purported to be an Alabama Independent School Association (AISA) Verification Release Form.  These forms were similar to the ACS forms signed by other private school officials.  The LCS enrollment form template was substantially identical to the ACS enrollment form template.  Parents or guardians did not sign the enrollment forms and did not otherwise consent to the transfer of their children's identifying information to LCS.

12

n.  CORKREN subsequently delivered those enrollment forms to SISK. SISK kept the enrollment forms signed by the Monroe Academy headmaster at the LCS central office in Athens, Alabama. An LCS official then caused the Monroe Academy students to be formally enrolled as students of the Limestone County Virtual School. The Monroe Academy students and their parents did not consent to this enrollment and were not necessarily aware of the enrollment. Moreover, the Monroe Academy students and their parents did not intend to and did not un-enroll from Monroe Academy for the 2016–2017 school year. These students continued to attend Monroe Academy on school days during the school year. Their parents continued to pay tuition to Monroe Academy. The students received instruction on the campus of Monroe Academy from Monroe Academy teachers.

o.  On or about an unknown date, CORKREN delivered laptop computers to Monroe Academy. These laptop computers were the property of LCS.

p.  SISK acknowledges and agrees that, if this case went to trial, the government would be able to prove that, throughout the 2016–2017 school year, CORKREN used money Ed Op received from ACS and LCS to make monthly payments to private schools, including Monroe Academy.

q.  SISK acknowledges and agrees that, if this case went to trial, the government would be able to prove that, at the end of the fall 2016 semester, Monroe Academy officials provided report cards to CORKREN. CORKREN then, assisted by co-defendant WILLIAM RICHARD CARTER, JR., an employee of ACS, converted the Monroe Academy report cards into "Ed Op" report cards. CORKREN provided

the Ed Op report cards to LCS officials.  Each Ed Op report card had the following certification: "The following student has met the Alabama Course of Study Standards for the following assigned courses/classes.  The awarded credit (Grades 9-12) is based upon the recommendation of the subject area's highly qualified teacher of record for this student and the grade below indicates the percentage of mastered standards.    The Ed-Op administration and our certified teachers/counselors assessed and confirmed this awarded credit. The Final Yearly Average column is the 1st and 2nd Semester Average grades K-8."

r.   As SISK knew, the Monroe Academy students in fact remained full-time students of Monroe Academy and were not receiving instruction from any LCS teachers or LCS curriculum.  The grades reflected on the Ed Op report cards were grades earned in face-to-face private school classes taught by Monroe Academy teachers.

s.   On or about October 12, 2016, using wire communications in interstate commerce, officials of the Alabama State Department of Education (ASDE) received from LCS average daily membership information.  The ASDE officials would use this information to determine the district's funding level for the 2018 fiscal year.  As SISK then knew, the district's average daily membership information falsely included private school students as being full-time virtual students of LCS.  These students were not, in any way, actually taking full course loads through a public virtual school program.  The number of falsely enrolled students exceeded 200.

t.   On a date unknown, SISK instructed CORKREN to pay the excess money that CORKREN had been setting aside to a charity, Charity A.  During an in-person

14

meeting, SISK wrote the name of Charity A on a napkin. SISK also wrote on the napkin an address for Charity A to which CORKREN should send the check. The address was SISK's personal residence.

u. Thereafter, on or about January 3, 2017, CORKREN caused Ed Op to issue a check from an Ed Op account to Charity A in the amount of $15,000. On or about January 13, 2017, Charity A deposited into its account the $15,000 check from Ed Op. Subsequently, on or about January 20, 2017, SISK caused Charity A to wire $13,000 from its account to a personal account of SISK's. SISK then used money obtained from Ed Op through Charity A for personal expenses, including, but not limited to: trips to New Orleans, Louisiana and Denver, Colorado; expenditures at hobby shops.

v. On or about January 23, 2017, SISK telephoned CORKREN. During the telephone call, SISK asked CORKREN to prepare a modified version of the LCS-Ed Op contract approved by the LCS board of education. SISK asked CORKREN to edit the board-approved contract so as to reflect that LCS owed Ed Op $55 per student. On or about that same date, CORKREN converted a portable data format (hereinafter, "PDF") version of the board-approved, executed contract into a Microsoft Word document. CORKREN then edited the payment provision of the Word document as SISK instructed. CORKREN then converted the edited Word document to a PDF document. Thereafter, CORKREN sent an email message to SISK's personal email account. Attached to the message was the modified PDF-version of the contract.

15

w. On or about January 26, 2017, two officials of the ASDE visited SISK and the LCS office. The ASDE officials came to gather information about the Limestone County Virtual School. During the meeting, SISK provided the ASDE officials copies of the enrollment forms signed by the Monroe Academy headmaster. The ASDE officials asked why each form was signed by the same person. SISK admitted that Limestone County Virtual School had been counting students who were in fact full-time private school students. The ASDE officials told SISK that this was improper.

x. Thereafter, on or about the same day, SISK telephoned TREY HOLLADAY. SISK told TREY HOLLADAY about his encounter with the ASDE officials. TREY HOLLADAY responded, "Our books are in order, are yours?" TREY HOLLADAY also told SISK that he had coordinated to have ACS employees administer state-mandated standardized tests to private school students and then said, "I bet y'all didn't think of that." TREY HOLLADAY offered that an ACS official, co-defendant CARTER could assist SISK in administering tests to the private school students enrolled in Limestone County Virtual School.

y. CARTER did then work with CORKREN to schedule standardized testing for the Monroe Academy students enrolled in the Limestone County Virtual School.

z. In or about April of 2017, SISK sent a letter to CORKREN cancelling the contract between LCS and Ed Op.

aa. In or about May of 2017, SISK sent a letter to the ASDE reporting that LCS had included private school students in its fall 2016 average daily membership report.

16

SISK asked that those students be removed and that LCS not receive funding for the private school students.

bb. The ASDE complied with the request and LCS did not receive funding for the private school students. In total, SISK personally received approximately $13,000 from his participation in the scheme.

## VI. THE DEFENDANT'S WAIVER OF APPEAL AND COLLATERAL ATTACK

23.     Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights conferred by 18 U.S.C. § 3742 to appeal the conviction or sentence. The defendant further expressly waives the right to attack the conviction or sentence in any post-conviction proceeding, including proceedings pursuant to 28 U.S.C. § 2255. Exempt from this waiver is the right to appeal or collaterally attack the conviction or sentence on the grounds of ineffective assistance of counsel or prosecutorial misconduct.

24.     In return for the above waiver by the defendant, the government does not waive its right to appeal any matter related to this case, as set forth at 18 U.S.C. § 3742(b). However, if the government decides to exercise its right to appeal, the defendant is released from the appeal waiver and may pursue any appeal pursuant to 18 U.S.C. § 3742(a).

## VII. BREACH OF THE PLEA AGREEMENT

25.     The parties agree that the issue of whether either party has breached this agreement at any time is one that will be resolved by the Court by a preponderance of the evidence, except as set forth in paragraph 27. The parties agree that, should either party obtain information causing the party to develop a good faith belief that the other party has breached this agreement, then the

17

party will promptly file a written motion—or make an oral motion if doing so would be more expedient—asking that the Court declare the other party to be in breach of the plea agreement.

26.     The parties agree that a breach of the plea agreement by the defendant would include, but not be limited to: (1) failing to fulfill each of the defendant's obligations under this plea agreement; (2) committing new criminal conduct; or (3) seeking to withdraw the guilty plea or otherwise engaging in conduct inconsistent with an acceptance of responsibility.  Should the Court find the defendant to have breached this agreement: (1) the government will be free from its obligations under this agreement; (2) the defendant will not be permitted to withdraw the guilty plea; (3) the defendant's obligations and waivers under this agreement will remain in full force and effect; (4) the defendant will be subject to prosecution for other crimes; and (5) the government will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding, all statements by the defendant and any information or materials provided by the defendant, including statements made during the plea hearing and all statements made by the defendant pursuant to proffer letters.

27.     The parties agree that, in the event that the defendant breaches this agreement by committing new criminal conduct, the government will be required to only establish probable cause to believe that the defendant committed a new criminal offense for the Court to find the defendant in breach of the plea agreement.

28.     The parties agree that, should the Court find the government in breach of this plea agreement, the defendant may cancel this agreement and thus be released from the appellate and collateral attack waivers.  The parties further agree that a breach of the plea agreement by the government will not automatically entitle the defendant to withdraw the guilty plea and, if the

defendant should seek to withdraw the guilty plea on the basis of such a breach, then the defendant will be required to file a motion pursuant to Rule 11(d), which the government could oppose.

## VIII.   THE DEFENDANT'S ACKNOWLEDGEMENTS

29.     The defendant acknowledges that the Court is neither a party to nor bound by this agreement.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the Court will determine the advisory Guidelines range and the sentence.  The defendant acknowledges that the defendant and the defendant's attorney have discussed the advisory Guidelines and the statutory sentencing factors set forth at 18 U.S.C. § 3553(a) and the defendant understands how those provisions may apply in this case.  The defendant further understands that the defendant will have no right to withdraw a guilty plea on the basis that the Court calculates an advisory Guidelines range that differs from the range projected by the defense attorney or the government.

30.     The defendant acknowledges that the defendant authorized and consented to the negotiations between the government and the attorney for the defendant that led to this agreement.

31.     The defendant understands that: (1) in pleading guilty, the defendant may be required to make statements under oath; and (2) the government has a right to use against the defendant, in a prosecution for perjury or for making a false statement, any statement that the defendant makes.  However, as the defendant understands, the government may not use as evidence against the defendant in any future proceeding involving the charges alleged in the Indictment or related offenses, the defendant's guilty plea if the Court permits the defendant to withdraw that guilty plea.

32.     The defendant understands that if the defendant pleads guilty pursuant to this agreement and the Court accepts that guilty plea, the defendant will waive certain rights, namely: (1) the right to plead not guilty or to persist in a plea of not guilty; (2) the right to a jury trial; (3) the right to be represented by counsel—and if necessary to have the Court appoint counsel— at trial and at every other stage of the proceeding; and (4) the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

33.     The defendant understands: (1) the nature of each charge to which the defendant is pleading guilty; (2) the maximum and minimum possible penalties associated with each charge to which the defendant is pleading guilty, including imprisonment, fine, and a term of supervised release; (3) any applicable mandatory minimum penalty associated with a charge to which the defendant is pleading guilty; (4) any applicable forfeiture provision applicable to a charge to which the defendant is pleading guilty; (5) the Court's authority to order restitution; and (6) the Court's obligation to impose a special assessment.

34.     The defendant confirms that the entirety of any agreement between the defendant and the government is set forth in this agreement and any addendum to this agreement and that the government has not made any promises to the defendant other than those contained in this agreement and any addendum to this agreement.  This agreement consists of 22 pages and 39 paragraphs and an addendum.

35.     The defendant confirms that counsel has competently and effectively represented the defendant throughout the proceedings leading to the entry of a guilty plea.  The defendant is satisfied with such representation.

36.     The defendant acknowledges that the defendant enters this plea agreement and pleads guilty freely and voluntarily.  That is, the defendant acts without being influenced by any threats, force, intimidation, or coercion of any kind.

37.     The defendant understands that this agreement binds only the Office of the United States Attorney for the Middle District of Alabama and that the agreement does not bind any other component of the United States Department of Justice, nor does it bind any state or local prosecuting authority.

### IX. THE ATTORNEYS' ACKNOWLEDGEMENTS

38.     The attorneys for the government and for the defendant acknowledge that this plea agreement contains the entirety of any agreement between the parties and that the parties reached this plea agreement in accordance with the procedure set forth at Rule 11.

39.     The attorney for the defendant confirms that the attorney for the defendant advised the defendant of: (1) the nature of the charges to which the defendant is pleading guilty; (2) the penalties associated with those charges; (3) the rights that the defendant is waiving by pleading guilty; and (4) the possibility that statements made by the defendant under oath during a plea hearing may be used against the defendant in a subsequent prosecution for perjury or for making a false statement.

This ___7th___ day of ___April___, 2021.

Respectfully submitted,

VERNE H. SPEIRS
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. § 515

21

Jonathan S. Ross
Assistant United States Attorney

Alice S. LaCour
Assistant United States Attorney

Brett J. Talley
Assistant United States Attorney

Thomas Michael Sisk
Defendant

Russell Crumbley
Attorney for the Defendant

22